**REPUBLIC INSURANCE COMPANY, Appellant,**

v.

**STATE FARM INSURANCE COMPANY et al., Appellees.**

No. 16837.

Court of Civil Appeals of Texas.

Fort Worth.

June 2, 1967.

Rehearing Denied June 30, 1967.

———◆———

Crumley, Rouer, Murphy & Shrull, R. E. Rouer and J. Roy Hudspeth, Fort Worth, for appellant.

Brown, Herman, Scott, Young & Dean, and Richard E. Miles, Fort Worth, for appellees.

OPINION

RENFRO, Justice.

Appeal from a summary judgment.

The Republic Insurance Company instituted suit for declaratory judgment that it had no coverage in effect on a 1953 Chevrolet operated by Darrell Wayne Fulton on May 23, 1965, and declaring that it had no duty under its policy to defend Darrell Wayne Fulton in any lawsuits based on or arising out of a collision which occurred on May 23, 1965.

Defendants were State Farm Insurance Company, which insured Darrell Wayne Fulton's parents; Darrell Wayne Fulton; Robert George Brooks and Florence Brooks, occupants of the car involved in a collision with Fulton; and Paul and Geneva Dietiker, who carried a liability policy with Republic Insurance Company.

Motion for summary judgment was filed by Fulton and State Farm Insurance Company.

Republic also filed motion for summary judgment.

Summary judgment, based on pleadings, depositions and affidavits, was rendered by the court against plaintiff, Republic Insurance Company. The judgment decreed that plaintiff, under its insurance policy, had coverage on the 1953 Chevrolet owned by the Dietikers, involved in the collision, while driven by Fulton, and it had the duty to defend Fulton and the Dietikers in any lawsuit arising out of the May 23, 1965 collision.

Plaintiff appealed on the ground that a fact issue arose as to whether the Dietikers insured all owned automobiles with plaintiff, and the court erred in declaring that plaintiff's company had coverage in effect on the automobile in question.

As of the date of the collision the Dietikers owned a 1960 Ford insured by plaintiff. Early in 1965 they bought a

1954 Ford. The 1953 Chevrolet was bought by the Dietikers a week before the collision between it and the Brooks automobile.

The gist of the appeal is whether the 1954 Ford was an automobile as contemplated by the following provisions of the Dietikers' policy issued to them by plaintiff: " * * * 'owned automobile' means * * * (c) a private passenger, farm or utility automobile ownership of which is acquired by the named insured during the policy period, provided (1) it replaces an owned automobile as defined in (a) above, or (2) the company insures all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and the named insured notifies the company during the policy period or within 30 days after the date of such acquisition of his election to make this and no other policy issued by the company applicable to such automobile. * * * "

It is the position of plaintiff that Dietiker did not have all owned automobiles insured with Republic at the time he acquired ownership of the 1953 Chevrolet, and, therefore, since no insurance was purchased on the 1953 Chevrolet it was not an insured or owned automobile at the time of the collision; that at the time of the acquisition of the 1953 Chevrolet Dietiker owned and had valid title to a 1954 Ford which was not insured by plaintiff.

It is the position of appellees, State Farm and Fulton, that the 1954 Ford was "junk" and therefore not an automobile within the meaning of the heretofore quoted policy provision.

On June 6, 1964, Republic issued its family combination automobile policy No. ACF 1–385114 to Mrs. Dietiker. At that time the insured automobile was a 1957 Ford. On November 2, 1964, Dietiker traded the 1957 Ford in on a 1960 Ford, and on the same date a substitution of automobile endorsement form was issued showing the 1960 Ford substituted for the 1957 Ford.

The policy was issued for one year beginning June 6, 1964.

In January, 1965, Dietiker bought a 1954 Ford from Fulton and towed it to his house.

On May 17, 1965, Mrs. Dietiker bought a 1953 Chevrolet. Six days later Fulton, with Mrs. Dietiker's permission, was driving the 1953 Chevrolet when the unfortunate accident occurred. Since the accident happened only six days after she acquired the 1953 Chevrolet she had not notified the insurance company of its acquisition, but did notify the issuing company on the date of the accident.

By deposition Mrs. Dietiker testified: Darrell Wayne Fulton, age 16, is her brother; she moved to Fort Worth from Clifton but continued to give Aars and Dahl of Clifton her insurance; she and her husband bought a 1957 Ford from her father, and later traded it in on a 1960 Ford; they bought the 1954 Ford in January, 1965; her husband wanted to "fix it up" for her; her husband drove it from the used car lot to the garage; he never used it; she never used it; it did not have any brakes; husband sprayed a little paint on it; the 1954 Ford sat in yard all the time they had it, it was never used; it was never in the street; it was on blocks; it had bad fuel pump and generator; when they moved they pulled in the 1954 Ford; at the new residence they pushed it into the garage; bought the 1954 Ford with intention of fixing it up and using it; on May 17, 1965, six days before the collision, she bought the 1953 Chevrolet; it was in good running condition; she loaned it to her brother; she paid $95.00 for the 1954 Ford; the car dealer wrote on the receipt, "sold as is"; it was not used from January through May of 1965; it was never in "drivable condition" after it reached their yard; they never got a license for it; it was rusted and faded and looked like a junk automobile; they sold the 1954 Ford to a junk and salvage dealer for $25.00 or $30.00; the dealer had to drag

it away; they never, while they had it, even thought of insuring it.

After the 1953 Chevrolet was demolished in the collision she called Aars and Dahl and was told, "I'm sure you're covered. * * *"

The Dietikers never had the 1954 Ford inspected; they did not intend for the 1954 Ford to be a replacement for the 1960 Ford, and did not intend for the 1953 Chevrolet to be a replacement for the 1954 Ford.

Mr. Dietiker testified by deposition: he bought the 1953 Chevrolet for his brother-in-law but title was in his name; he bought the 1954 Ford in January, 1965, after he bought the 1960 Ford and before he bought the 1953 Chevrolet; paid $90.00 for the 1954 Ford; he signed for the 1954 Ford and Darrell was going to buy it from him, but it would never run so Darrell decided he did not want it; he towed it home from Darrell's house; he never got it to run; it was pretty well rusted out; it did not have any brakes, the engine would not run, it had a bad roar in the rear end; the generator was bad; witness towed the 1954 Ford to his yard and just left it there, never moved it; when he moved to another house he towed the 1954 Ford; that was before the 1953 Chevrolet was in the accident; said the witness, " * * * I'm a shade tree mechanic just like the biggest part of the people in my income, they have to fix their own cars half the time"; he looked under the hood, tried to start the car and it would not run; the following questions and answers were made:

"Q. What else did you do besides check to see if it was getting fuel and check to see if it was getting any sparks?

"A. That was it.

"Q. Was it getting any sparks?

"A. Yes, sir.

"Q. It was getting sparks all right?

"A. Yes, sir.

"Q. Was it getting any fuel?

"A. No, it wasn't getting any fuel.

"Q. It wasn't getting any fuel. All right. Then when you established that it wasn't getting any fuel was there anything else that you discovered?

"A. No, sir, I don't think so.

"Q. So all that was the matter with it, as far as you know, that you discovered, is it wasn't getting any fuel?

"A. Well, it wouldn't run.

"Q. Well, if it's not getting any fuel it won't run?

"A. That's right.

"Q. But that's all that you discovered was wrong with it?

"A. Why, sure.

"Q. Did you ever have a car that didn't get fuel before?

"A. Sure have.

"Q. What did you do about that?

"A. Well, you either put a new fuel pump on or find out. You might have lines choked up, or several things wrong.

"Q. Did you ever check the fuel pump on this car?

"A. Never took it off.

"Q. Do you know how to check a fuel pump?

"A. Sure do.

"Q. Do you know how to check a gas line?

"A. Sure.

"Q. Well, checking the fuel pump is not too difficult, as I understand it, Mr. Dietiker. You never unscrewed that little nose that goes to it and had her turn the car over?

"A. Never took it off."

He "aired" up the tires when he towed it to his new residence; it would have to have a brake job before it could be driven on the highway; when it was being towed the rear end made a racket, "I called it a howl. It was awful bad. * * *" He sold it for $25.00 or $30.00 to get it off the place; in the new place he kept the car in a garage; the buyer towed it off; "1954 Ford junker" pretty well described the 1954 Ford; originally he paid $90.00 for it; it was pretty well rusted out at that time; he could never get it started, it never did run; shortly after Dietiker obtained the 1954 Ford he decided he would not attempt to repair it because it was in such bad shape it would not pay him to fix it up; it was just a "junk" automobile; the man who bought it intended to "junk" it out; they sold the Ford before the accident to the 1953 Chevrolet and had collected some of the purchase price.

Appellees also made an affidavit by Dietiker a part of the motion for summary judgment. In so far as the condition of the 1954 Ford is concerned the affidavit was substantially the same as the deposition.

The following affidavit by Darrell Wayne Fulton was made a part of the motion: "My name is Darrell Wayne Fulton. I reside in Fort Worth, Tarrant County, Texas. I am 17 years of age. In the early part of the year 1965, I think January, I got a 1954 Ford car from Bowden's car lot. I don't know for sure if it was put in my name or in my brother-in-law's name. My brother-in-law is Paul Dietiker. I don't know just how long I had the car, it wasn't very long though. I only made one or two payments. I think the payments were $10.00 a week. When I got the car it would just barely run. After two or three weeks the engine just quit and it never would run again. When the car quit running I just parked it. I never did get any tags for it. After Paul took it over to his house, it never did run again. I don't think it was ever driven again after that. Besides the engine not working, the brakes

were shot and it had a loud noise in the rear end. This old 1954 Ford was just an old junk car and we didn't pay but about $90.00 for it. Paul never did get around to doing any repairs on the car. He finally sold it for a few dollars to some boy, I don't know what the boy's name was."

The depositions of the Dietikers and the affidavits of Dietiker and Fulton constituted all the evidence before the court.

All three were interested witnesses.

■ In determining the question of whether or not material issues of fact are raised on a motion for summary judgment, the court must view all the evidence in the light most favorable to the party against whom summary judgment is sought, and must indulge in favor of such party every intendment reasonably deducible from the evidence. Smith v. Bolin, 153 Tex. 486, 271 S.W.2d 93 (1954); Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (Tex. Sup., 1952).

In Pierce v. Reynolds, 160 Tex. 198, 329 S.W.2d 76 (1959), in a summary judgment proceeding, the Court, referring to a deposition, said: "At best it simply raises a question of fact on that issue, and summary judgment may not properly be granted even on the testimony of the opposite party when that testimony will support either of two contrary conclusions with respect to a material issue of fact."

■ In the instant case we think the evidence is such that a finding could have been made to the effect that the 1954 Ford was an automobile within the contemplation of the language used in the policy.

In discussing the evidence in another summary judgment proceeding, the Supreme Court in James T. Taylor, etc. v. Arlington Ind. School District, 160 Tex. 617, 335 S.W.2d 371 (1960), held: "While these facts, if true, would not necessarily bar equitable relief where the elements of remediable mistake are present, still we think that the trial court's summary judg-

**562**

ment should not have been granted, for the reason that the record shows that the only witness testifying with reference to the error was Hicks, *who was an interested witness.* (Emphasis added.) The general rule is that the testimony of an interested witness does no more than raise a fact issue to be determined by the jury. While there are two exceptions to the rule, it seems settled that when testimony comes from an interested party and is of such a nature that it cannot be readily contradicted if untrue, an issue relating to the credibility of the witness is presented."

In our case the appellant certainly was not in position to readily contradict the evidence as to Dietiker's intention regarding to the condition of the 1954 Ford. It did not even know such car existed until after the Dietikers had disposed of it. Neither was it in position to readily rebut the evidence as to Dietiker's intention regarding final disposition of the Ford, or his opinion evidence. Thus the evidence of Dietiker and the other two witnesses presented the question of credibility to the court. In order to find as he did he had to accept the evidence of the interested witnesses as true, thus passing on the credibility of the witnesses.

It may well be that appellees will be able to prove that the 1954 Ford was not an automobile as contemplated by the policy provisions. See Canal Insurance Co. v. Brooks, 201 F.Supp. 124 (U.S.Dist.Ct., W.D.La., 1962), affirmed, 5 Cir., 309 F.2d 751, and Civil Service Employees Ins. Co. v. Wilson, 222 Cal.App.2d 519, 35 Cal.Rptr. 304 (Dist.Ct.App., 5th Cir., 1963).

Viewing the whole record, however, in the light most favorable to the party (Republic Ins. Co.) against whom summary judgment was granted, we must hold that a material fact issue was presented as to whether or not the 1954 Ford was an automobile within the meaning of the policy provisions involved, and therefore summary judgment should not have been granted.

Reversed and remanded.